Thank you, Your Honors, and good morning. May it please the Court. My name is Bruce Ortega of the California Attorney General's Office, and we represent the appellant, the warden in this case, and we are challenging the district court's grant of habeas relief to Mr. Hutchinson on two grounds. And I'm going to focus my remarks this morning on only one of those grounds, that is our challenge to the district court's finding that Mr. Hutchinson was prejudiced by his trial counsel's deficient performance in not investigating and presenting evidence on the question of whether the robber, as shown in the videotape, was too short to have been Mr. Hutchinson. First of all, you really didn't dispute, even in the district court, that the performance was deficient, did you? I believe we did, Your Honor. Your Honor, in our post-trial briefing, we made the argument that we thought if Mr. Kazabowski, the trial counsel, was to be believed on some of the things he said, that that showed a tactical basis. When the trial court made credibility findings adverse to Mr. Kazabowski and adverse to our position, we feel like we cannot make an argument that we are not pursuing that here on appeal. We are not, Your Honor. Strictly the prejudice policy. So you're on to the prejudice problem. Correct. And as this Court made clear in the case of Luna v. Camera at 306 F. 3rd, 961, in an AEDPA case like ours, where there was no reasoned decision from the State court on the IAC issue. That's pretty clear here. That's correct, Your Honor. And where the district court holds an evidentiary hearing that the independent review that this Court undertakes to determine whether the State court rejection was an unreasonable application of Strickland necessarily encompasses both the evidence at trial and the evidence presented at the evidentiary hearing. As we see this case, it comes down to this question. Is confidence in the verdict undermined? Is there a reasonable probability that had the photogrammetrist expert, Mr. Stutchman, testified at the trial, as he did at the evidentiary hearing, that one or more jurors would have had a reasonable doubt about Mr. Hutchinson's guilt? Now, the district court said yes, obviously. The district court said that the State court's failure to find that petitioner suffered prejudice as a result of this counsel's deficient performance was an unreasonable application of Strickland. We submit that the answer should be no, that even factoring in Mr. Stutchman's evidentiary hearing testimony, that there's no reasonable probability one or more jurors would have had a reasonable doubt about his guilt. And our position is this. Mr. Stutchman offered no opinion, no expert opinion, on the true or actual height of the 7-11 robbery. Mr. Stutchman's expert opinion was ignoring the posture of the man as shown in the videotapes. I suppose this is kind of glass half empty, glass half full stuff. What he said was that the person in the videotape, the robber in the videotape, could not have been taller than what, 5'6", 5'7"? That's not what I understand his testimony to be, Your Honor. I understand his testimony to be that from the bottom of his feet to the top of his head, as shown in the posture in the videotape, that the maximum was 5'6". So the question then becomes... That's different from 5'6"? Correct. Because you're not standing erect. Your height is based on how tall you are when you're standing erect. I thought he did a number of measurements and was still photographs, and that he came to a series of conclusions about height, opinions about height, and they were as low as 5'2", and as high as 5'7", right? They were as low as 5 foot, as high as 5 foot, 6 1⁄2". But I would dispute that his conclusion was height. I would argue that his conclusion was from the bottom of his feet to the top of his head, as shown in the video, ignoring his posture. The jury, after listening to that testimony, have had doubt as to whether a person 6'2 could have committed the crime. I don't think so, Your Honor, for this reason. For this reason. In one of the photos, he's 5'5". In another photo, it's 5'6". So there's a 6 1⁄2 inch difference there from his movement, from his posture. The expert thought that one of the photographs was probably the most accurate in the sense of estimating height. It was when he was exiting, the robber was exiting the store, right? Correct, Your Honor. And it appeared as if the robber was fully erect at that point. Trial Exhibit 14, which is in the excerpts of record, he argued, shows the robber as close to fully erect. We would argue that that's not a reasonable inference from that picture. It's taken from the back. His knees are bent. I don't think a juror would accept the argument that that man could not have been hunched over anywhere from a few to several inches. We just don't know. That question, the crucial question, there's just no expert evidence on that. It would have come down to arguments among the prosecutor and defense counsel. Defense counsel arguing what Mr. Stuchman did. Look at that picture. Mr. Hutchinson is either 6 foot, according to one witness, or 6 foot 2, according to another witness. In this picture, the man is 5 foot 6 and a half inches. He can't be hunched over. That would be 5 and a half to 7 and a half inches in that photo. The prosecutor would have argued you can't make that judgment in that picture. The picture shows only his back. His knees are bent. But the fact is, the only evidence in the record is the opinion of the expert, and he made that judgment. He said, you know, this is close to fully erect, right, as you're going to get. And on that basis, he said, you know, the defendant couldn't be the robber. That's what he argued. That's the only evidence in the record. I mean, there was argument by you or whoever in your office was there, but you didn't put out any counter evidence. That's correct. We thought that's correct. We did not. But I would argue that the jury would not have been compelled to accept that expert evidence, that the jury would not have been compelled to accept that that man is fully erect and that he can't be hunched over. The test is not whether the jury can be compelled to accept the evidence. You can never direct a verdict in a criminal case. The question is whether with that evidence, it would be more likely than not that a different result would probably eventually occur. You're correct, Your Honor, and I apologize for my misspeaking. My argument would be that there's no reasonable probability that this jury would have found guilt based on the evidence of Mr. Stutsman, because it's just not, it seems to me, sufficient to say that he could not have been hunched over 5 1⁄2 to 7 1⁄2 inches when he was hunched over in some of the photos shown at least 5 1⁄2 to 6 inches. And then when you measure that against what we would submit, and I fully acknowledge that the district court found the prosecution's evidence at trial to be weak, we take exception to that position. In our view, the evidence at trial was not weak. First of all, we have a victim who knew the defendant. He was a regular customer, had given the defendant, the defendant had given her his name. She testified that she recognized him outside the store as he put the nylon over his head. Yeah, but there was another witness who talked to her, the store clerk, fairly quickly after the crime. They talked about it, and she said nothing about seeing him outside. I disagree again with that, Your Honor. The testimony with respect to the police officer is neither the victim nor the police officer could remember whether she had told him about seeing him. But Mr. Sallet testified to this, Your Honor. He testified that he could not recall what she told him, Ms. Lomelli, about the incident other than, quote, somebody had peeked around the corner, end quote. That's at RT 90. She said somebody pulled something down over their head. I would suggest a reasonable inference from that is she was trying to tell Sallet, the store clerk, after the incident, what she ultimately testified to at trial. She saw him outside putting something over his head. She said somebody pulled something down over their head. Somebody pulled something, right? And she also. Hutchinson, known to me for 15 years. No, she didn't say that, but she did say this, Your Honor. It was your friend. And as Mr. Sallet, to Mr. Sallet. And as Mr. Sallet testified, the Petitioner was his friend. She also said, I couldn't remember his name at the time because the other times I had seen him, he had worn a ponytail. This isn't just mere eyewitness testimony. I don't believe that it is, Your Honor, especially when the Petitioner himself testifies that the victim knows him well. Well enough, he testified that she asked him out on dates several times. So if he's to be believed there, he's corroborating in a sense that she can recognize him. If he's lying, that's consciousness of guilt. And we think that the prosecution did not present a weak case and that Mr. Stutzman's evidence, because it isn't expert evidence that this man could not have been the Petitioner's burden is not to establish actual innocence, but reasonable doubt. Correct. In the mind of a single juror. Correct. That's the camera's language. And we would argue that that test just is not met. Unless the Court has any further questions, we'd reserve the rest of our time. I don't see any. Thank you very much for your argument here today. Mr. Gardner. Welcome back. To be back. Thank you, Your Honor. We don't have standing room only today. Well, it's pretty close. That's because they heard you yesterday. That's why they're staying away, I assume, Your Honor. I'm just kidding, of course. I take it in the spirit it was intended, I hope. Cliff Gardner, appearing for Petitioner and Appealee Michael Hutchinson.  to Mr. Stutzman. the prejudice issue, and start with a question Your Honor asked, and that is this is not an actual innocence case. This is a Strickland case in effective assistance of counsel, which requires us to establish that the evidence counsel didn't present undermines confidence in the outcome of trial. And I want to just emphasize two factual points. I think I can clear something up. What Mr. Stutzman did is he analyzed the videotape and made seven still photographs, so he would get the suspect in a full measure of his stride, of his running stride, from the shortest to the tallest. The shortest was five feet. The tallest was five, six and a half. And indeed, as he testified, that the one in his trial exhibit 13, it's in the brief at page 21 in Appealee's brief, and it's in the excerpt of record at page 162. He testified that as you look at that, the defendant or the suspect is not only at his tallest. He's nearly erect. He's at the closest to the height bar, so this was indeed the best picture. In this picture, he's five, six and a half. Did he give any opinion as to the difference between at his tallest and standing straight up? No, he didn't. He said, I'm not a biometrics expert. Indeed, neither side called a biometrics expert to suggest that in this photo he could be, as the State now argues, seven and a half inches shorter than six foot two. There were no marks on the door, right? Yes, there are. Were they there before the robbery, or they were? They were. This is actually something I learned in the course of this case, is that many convenience stores have these height marks on the door precisely for this purpose. And there's no suggestion that those marks were changed or altered in any way between the time of the robbery and the time the expert made his observations? No, it's just the opposite, because the photograph was taken at the time of the robbery with the height strip on the tape. So it was conceded by the parties that the height strip. There's no straightforward opinion testimony on what I'll refer to as the actual doctor's office height of the robber, is there? That's correct. So, I mean, you can see there's at least a pretty good possibility, right, that the person in the surveillance video could have been as tall as the defendant? I'll concede he could be taller than the apparent height he appears on the video, which is five, six and a half. Then the question is, let's look at that photo and see, could he be 6'2", which is what he'd have to be. And the question isn't really could he be 6'2". That would be an actual innocence claim, which I'm not raising. The question is, is the absence of this photo undermine confidence in the outcome of trial? And let's take a look at the photo. Counsel and I have talked about the photo. Your Honors have copies of it at page 21 and page 162. The question, 162 of the excerpt, if you look at this photo, and the question is, is there some way a reasonable juror could look at that photo and say, gosh, I think there's another 7 1⁄2 inches in that frame. I think I could have established an actual innocence claim, because I think the answer is, you know, this person isn't 6'2". But that's not what I have to prove. As counsel suggested, and he was right about this, the standard is, would one or more jurors have had a reasonable doubt? And the answer is, looking at this photo, the answer is yes. And the thing I would add to that is that when Mr. Stuchman testified at the evidentiary hearing, his testimony was uncontradicted as to all these facts. It was undisputed. The State did not call an expert. And the district court found not only that he was very credible, but that his testimony was very persuasive. And you look at the photo, and you see why the district court reached that decision. It was very persuasive. Would not a single juror among 12 look at a photo of someone who's 5'6 and think that he's 6'2"? That's not likely to happen. But at the same time, you know, in terms of the Brecht test of, you know, undermined confidence and substantial doubt, there is a lot of other evidence of guilt, right? Of identification, starting with the fact that the clerk says, well, sure, I know him. I saw him walking outside. I see him all the time. He's a regular customer. And, you know, we all know identification evidence is sometimes mistaken, but that's pretty strong identification evidence, isn't it? Well, actually, I mean, Your Honor raises a good point. I'm sure the Court is familiar with the series of exonerations throughout the country. Almost all of them are based on eyewitness testimony. Eyewitness testimony is suspect. In a case of an eyewitness testimony, that term is usually used to say that a person identifies someone unknown to them from a lineup. This isn't a person unknown to them. Lomelli knew this person personally. I mean, knew. Yes, and that's certainly in the State's favor. The difference, though, is that eyewitness testimony usually involves someone who's not wearing a mask. I mean, this person, the person who robbed the store was wearing a mask. This is an eyewitness identification of someone wearing a mask whose facial features can't be seen. This is an eyewitness identification from someone who, when she spoke to police officers right after the crime, said, here's what happened. I was standing at the cash register. I heard a noise behind me. I turned around, and there he was. At trial, this witness suddenly remembers that, indeed, she saw Petitioner Michael Hutchinson outside of the store hanging out, putting on a mask, and coming in the store. Those are very different stories. This was an eyewitness that was fired from her job for repeated cash shortages. This is not an eyewitness above reproach. So we're not talking about, you know, getting the pope on the stand and saying, do you recognize this person? Yes, I do. This is an eyewitness with serious problems. This was a case without a single piece of corroborating evidence. There was no physical evidence that tied Petitioner to the crime. There were no fingerprints that tied him to the scene of the crime. There were no confessions. There were no admissions. There are, you know, the cases, there are many cases, this Court's own cases, ineffective assistance of counsel cases, reversing for prejudice, even where there is an eyewitness identification, because the Court recognizes some of the problems with eyewitness identification. Returning for one moment, and really the last point I'll make, unless, of course, the Court has other questions, the counsel's argument as to the photo, that because there's no expert testimony, it's possible that this photo on page 162, that there could be an additional seven and a half inches, is really what I call, and I hope the Court appreciates the reference, the Groucho Marx argument. I used to be a great fan of Groucho Marx arguments. And he used to walk around with a cigar crouched. And that's really the argument, is that that's what this person was doing, albeit without the cigar. He was actually crouching down seven and a half or eight inches when that photo was taken. And if you look at that photo, and, you know, the Court has two copies of it now, you cannot see where in the person's body there's an additional seven and a half inches. So you're not relying upon Chico Marx? No. Not Chico or Zeppo. That's not what I'm referring to. Yes. Yes, I do. Of course, you know, he would have the motive to crouch, because he knew that marker was along the side of the doorway, right? I'm sorry, Your Honor? He would have the incentive to crouch, because he knew that the doorway was marked with a scale. He may have. Actually, I didn't. I wouldn't have had such a motive. Perhaps he did. Then the question is, did he crouch? And rather than have counsel and I argue, look at the photo. His left leg is bent. His right leg is straight. Counsel is saying he's bent at the waist seven and a half inches. There was no expert testimony. In fact, our testimony was undisputed at trial. Undermine confidence in the outcome of trial, jurors looking at this photo would have a great doubt. A prosecution expert witness who was a photogrammetrist could have testified, based on the inclination of the leg, how much or how little the head had been lowered, but there was no such testimony. Certainly. If they wanted to offer such testimony, they could have. In fairness, Mr. Ortega did try to hire an expert. The expert was excluded because, in fact, his qualifications weren't up to snuff. But as a result, there was no expert testimony from either side on this issue. Unless the Court has other questions. I don't see any. Thank you, counsel. Any rebuttal? Yes, Your Honor. Very briefly. Mr. Gardner and I agree on the significance of that photo. He says there can't be seven and a half inches there. There doesn't have to be seven and a half inches. There only has to be five and a half inches because, again, one witness said, the victim, he was six foot. There's no definitive evidence as to Mr. Hutchinson's height. Six foot, 6'2". Petitioners conceded below. There's other evidence that he's 6'1". Seven and a half, five and a half, six and a half inches, that's not a lot. Your Honor could take a ruler and see that there could be five and a half to seven and a half inches in that photo. If I'm wrong, I lose. It's that simple. I'd also like to say this about the statements about Ms. Lomelli and the cash shortages. In the record, we know that she lost her job for cash shortages. The story manager testified contradictorily that they were either frequent or a couple. There was no evidence as to whether they were intentional or accidental. Mr. Gardner said that her testimony changed at trial when she said that it was for the first time she saw the petitioner putting over the mask. Again, I would refer to what Mr. Sallet testified the victim saying, that he told her, she told him she saw somebody putting over a mask. So I don't think it's her inventing at trial for the first time that she saw his face. And again, I would repeat that the petitioner himself testified that this woman knew him well, well enough that she asked him out on dates numerous times. I'd like you to answer. Where in the record is the evidence of how tall Hutchinson is? Your Honor, there is only two references in the record. The trial record. There is Mr. Officer Emanuel's testimony that he was 6'2". There is the victim's testimony that he was 6'0". Then, as we were litigating this case pre-evidentiary hearing, there was a piece of evidence I attached to the motion for exhaustion, heights taken of Mr. Hutchinson in prison where he was at 6'0". And then, as Mr. Gardner correctly points out, there was his booking sheet which also came into evidence before the district court pre-evidentiary hearing that he's 6'1". Okay. Thank you very much. Thank you. Thank you, counsel. I thank both sides for their argument. The case to start will be submitted for decision.
judges: Hawkins, Tashima, Bea